IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

ANTOINE NELSON,

Plaintiff,

v. Case No. 25-CV-0032

KYLE TRITT, ET AL.

Defendants.

---

## DECLARATION OF KYLE TRITT

---

I, **KYLE TRITT**, declare pursuant to 28 U.S.C. § 1746 and under the penalty of perjury, that the following is true and correct.

1. I make this declaration based upon my personal knowledge and my review of the records kept in the ordinary course of business at the Wisconsin Department of Corrections (Corrections).

2. I am currently employed by Corrections as a Security Director at Oshkosh Correctional Institution. I have held this position since March of 2025. Prior to becoming Security Director, I was a Supervising Officer 2 (Captain) at Waupun Correctional Institution. I have held that position since November 2016 and have been employed with Corrections since 2007.

3. My previous duties as a Captain at Waupun included, but were not limited to: the supervision of all correctional officers, correctional sergeants, and Supervising Officers 1 (Lieutenants). I also had responsibility for the overall

direction and operation over an assigned shift and the responsibility for the supervision and treatment of inmates.

4. It is my understanding that Antoine Nelson (DOC#250267) alleges that on August 19, 2022, Lieutenant Burns and I used excessive force on him by deploying our tasers simultaneously, with alleged intent to injure him.

5. I have extensive training and experience with use of force situations in Corrections, both unplanned and planned. Corrections staff are trained on how to respond to certain situations which place an inmate, staff, or other inmates in danger. In order to gain control over a noncompliant subject, there are several tactics and tools that may be used. The use of a taser is sometimes required to achieve control after other techniques used to gain compliance fail, such as a presence of authority and verbal directives/orders.

6. I recall the incident at issue in this case. On August 19, 2022, I recall being on the Northwest Cell Hall housing unit as religious services were being let out. The Northwest Cell Hall is a general population unit and inmates are released as a group and escorted off the unit.

7. As I was observing inmate movement in the cell hall, I noticed Lt. Burns stopped in front of Nelson's cell I-19, as the cell door opened. As I walked over there, Lt. Burns yelled "drop it" while entering the cell. I noticed Nelson was initially on the top bunk, so I entered the cell right behind Lt. Burns. At that point Nelson jumped down from the top bunk and appeared to be holding a cell phone. Both Lt. Burns and I directed Nelson to set down the phone. Nelson would not

comply and when Lt. Burns reached out to grab the phone from his hand. Nelson quickly placed his right arm in the air, and he bladed his body away from us while lowering his center of gravity.

8. Nelson is taller than both Lt. Burns and me, and raising his arm high while being about three feet away from Lt. Burns was threatening, especially since he was being noncompliant with our directives, and was within striking distance. Nelson had also lowered his center of gravity and bladed his body away from us, which is known to be an attack posture.

9. Based on Nelson's stance, threat of possible assault, and not knowing his intentions, I removed the X26P taser from its holster. Just then, Nelson's right arm started making a forward motion, which I believed could be used to strike or assault Lt. Burns. I activated my taser. The probes struck Nelson in the left shoulder area. The taser activated to five seconds.

10. Simultaneously, Lt. Burns also deployed his taser and struck Nelson in a similar area. Based on how I was standing behind Lt. Burns, I did not notice Burns also had his taser ready. I was not focused on Burns and instead was keeping my eye on Nelson since he was noncompliant with our directives, posed a threat, and within striking distance to Lt. Burns.

11. Nelson had dropped to the ground in a seated position, and we directed him to lay down and place his hands behind his back so he could be put in handcuffs. At that point we noticed he had all four probes in his left shoulder area which Lt. Burns proceeded to remove. One taser activates two probes.

12. It is not part of our training to activate two tasers simultaneously to achieve control over a subject, nor was the use of two tasers in this instance planned or intentional.

13. Given the fast pace of the situation (merely seconds) and security staff no longer having a position of advantage over Nelson, I personally believed using the taser would be the most effective and least intense method of quickly gaining control over Nelson. The use of my taser was not intended to injure or hurt Nelson, but rather, to gain compliance since Nelson was not following orders, had unknown intentions, and had his body in an attack stance very close to Lt. Burns.

14. While I was also equipped with OC Spray, it would not have had the same effect and I would have also risked spraying Lt. Burns given his proximity.

15. We assisted Nelson to a standing position and Lt. Burns escorted him to the Restrictive Housing Unit. I am aware Nelson was offered medical attention in RHU and was cleared to return to a cell.

16. A true and accurate copy of the Incident Report I authored shortly after this incident is attached hereto as **Exhibit 1001**.

17. Nelson filed an internal inmate complaint about this incident, admitting to smashing the phone on the ground in an attempt to break it. A true and accurate copy of complaint WCI-2022-12575 is attached hereto as **Exhibit 1002**.

18. According to Burns and my taser activation records, Burns and I both triggered our tasers for a five second duration. A true and accurate copy of the

trigger activation records are attached hereto as **Exhibit 1003**.

19. Triggering refers to pulling and releasing the trigger switch, which results in a standard, five second discharge cycle. Officers with tasers can hold the trigger switch down when they utilize the taser, which results in a continuous discharge until the trigger switch is released up to the maximum five second discharge.

20. To go beyond the standard five second discharge, the officer would have to release the trigger and pull the trigger again. The trigger activation records show neither Burns nor I pulled the trigger a second time, as Nelson complied after the first taser deployment. (*See* Ex. 1003.)

*Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the statements in the foregoing declaration are true and correct.*

Executed on October 23, 2025.

s/ Kyle Tritt
**Kyle Tritt**